1  PETER D. KEISLER
   Assistant Attorney General
2  MICHAEL F. HERTZ
   LAURENCE J. FREEDMAN
3  JOHN F. HENEBERY
   LOUIS J. VIRELLI
4  DIANA J. YOUNTS
   California State Bar No. 161298
5      U.S. Department of Justice
       P.O. Box 261
6      Ben Franklin Station
       Washington, D.C. 20044
7      Telephone: (202) 305-8586
       FAX:       (202) 307-3852
8
   DEBRA W. YANG
9  United States Attorney
   DONNA C. MAIZEL
10 Assistant United States Attorney
       California Bar No. 84928
11     Room 7516, Federal Building
       300 North Los Angeles Street
12     Los Angeles, California 90012
       Telephone: (213) 894-3986
13     FAX:       (213) 894-2380

14 Attorneys for the United States of America

15         UNITED STATES DISTRICT COURT

16         CENTRAL DISTRICT OF CALIFORNIA

17             WESTERN DIVISION

18         ℗ CV04-857. GHK    (CTx)

19 UNITED STATES OF AMERICA,        ) Civil Action No.
                                    )
20       Plaintiffs,                ) COMPLAINT
                                    )
21 Tenet Healthcare Corp.;  Tenet   ) for liability of "Tenet" and "AMI's
   HealthSystem Medical, Inc.; and the ) hospitals" (as defined herein), for
22 hospitals identified on Attachment A to ) claims submitted to the Medicare
   This Complaint,                  ) Program from September 6, 1992 to
23                                  ) February 28, 1995,
       Defendants.                  )
24 ─────────────────────────────── ) for Payment by Mistake of Fact and
                                      Negligent Misrepresentation
25
                                      -AND-
26
                                      DEMAND FOR JURY TRIAL
27
28

DOCKETED ON CM

FEB 1 1 2004

BY _____ 001

N|F
L|N
N|S

For its Second Amended Complaint ("Complaint") regarding liability of "Tenet" and AMI's hospitals (as defined herein), the plaintiff, the United States of America ("United States" and "the government") alleges as follows:

## I.    NATURE OF ACTION

1.    The United States brings this action to recover all available damages, restitution, and other monetary relief under the common law, under the theories of payment by mistake of fact and negligent misrepresentation.

2.    In this Complaint, the United States sues Tenet Healthcare Corp.; Tenet HealthSystem Medical, Inc. (formerly known as American Medical International, Inc.) (hereinafter collectively referred to as "Tenet"); and Tenet's hospitals formerly owned by American Medical International, Inc. ("AMI").

3.    Attachment A, incorporated herein, lists each hospital that is sued in this Complaint.

4.    Tenet is sued in this Complaint for its liability as to the conduct of AMI and the hospitals formerly owned by AMI identified on Attachment A. Hereinafter, the hospitals on Attachment A will be referred to as "AMI's hospitals."

5.    This Complaint alleges the liability of each of AMI's hospitals for its conduct during the time it was owned, controlled, and directed by AMI, prior to the time Tenet Healthcare Corp. acquired AMI. For each such hospital, the beginning date of liability in this action is September 6, 1992, unless AMI or one of its direct or indirect subsidiaries acquired the hospital after that date, in which case the beginning date of liability is the date of that acquisition. Attachment A identifies the date of each such known acquisition. For each of AMI's hospitals, the last date of liability in this action is February 28, 1995.

6.    AMI and AMI's hospitals created false claims for Medicare payments, and submitted, or caused to be submitted, those claims to the United

1  States under the Medicare program during the period from September 6, 1992

2  through March 1, 1995.  Attachment A to this Complaint lists those false claims

3  that the United States has discovered to date. (The specifics of this listing are

4  described in more detail below in this Complaint).

5         7.     AMI and AMI's hospitals created false claims for Medicare

6  payments, and submitted, or caused to be submitted, those claims to the United

7  States under the Medicare program during the period from September 6, 1992

8  through February 28, 1995.  Attachment A to this Complaint lists those false

9  claims that the United States has discovered to date. (The specifics of this listing

10  are described in more detail below in this Complaint).

11         8.     The claims at issue in this action are false because AMI's hospitals

12  "miscoded" these claims. "Miscoding" is the improper assignment of diagnosis

13  and/or procedure codes that increase inappropriately the amount of

14  reimbursement.  That is, AMI's hospitals assigned diagnosis and/or procedure

15  codes that (a) were not supported by the patients' medical conditions and the

16  physicians' documentation of the patients' medical conditions in the medical

17  records; or (b) improperly designated secondary diagnoses as principal diagnoses.

18  AMI's hospitals made these assignments and designations in contravention of the

19  Medicare program's coding rules in order to increase inappropriately the hospitals'

20  reimbursement amounts.

21         9.     For the claims at issue in this action, AMI's hospitals billed

22  Medicare, or caused Medicare to be billed, through a coding assignment system

23  known as "DRGs" (Diagnosis Related Groups).  In the DRG coding system, a

24  hospital assigns diagnosis codes -- and any applicable procedure codes -- for each

25  patient discharge.  Those hospital-assigned diagnosis and procedure codes dictate

26  the DRG that is assigned to that  claim and thus determine the amount of

27  reimbursement that the hospital receives from the Medicare program for that

28

1   claim.

2        10.   AMI's hospitals' miscoding focused upon diagnosis and procedure

3   codes that grouped to four DRGs:  pneumonia codes that grouped to DRG  079,

4   septicemia codes that grouped to DRG 416, septicemia and procedure codes that

5   grouped to DRG 415, and respiratory system codes with ventilator support that

6   grouped to DRG 475.  AMI's hospitals upcoded diagnoses that would have

7   resulted in other, lower-paying DRGs, to diagnoses and/or procedures that resulted

8   in these four enumerated, higher-paying DRGs.  AMI's hospitals did so in order to

9   maximize their reimbursements from the Medicare program.

10        11.   As a result of AMI's encouragement (including but not limited to

11   AMI's undue emphasis on "optimizing" DRGs and hospital revenue with little or

12   no emphasis on compliance with coding regulations, and AMI's corporate-level

13   review process that primarily reviewed records with optimizable DRGs), coders at

14   AMI's hospitals were encouraged to, and did in fact, substitute their judgment for

15   that of the patients' physicians, entered false diagnosis and/or procedure codes on

16   claim forms, and improperly sequenced principal and secondary diagnoses, all

17   resulting in AMI's hospitals' receiving Medicare reimbursements greater than

18   those to which the hospitals were entitled.

19        12.   The United States seeks a judgment against Tenet Healthcare Corp.;

20   Tenet HealthSystem Medical, Inc.; and AMI's hospitals, jointly and severally, for

21   treble damages, plus civil penalties, and such other further relief as may be just

22   and proper.

23   **II.   JURISDICTION**

24        13.   This Court possesses subject matter jurisdiction over this action

25   pursuant to 28 U.S.C. § 1345.  The Court may exercise personal jurisdiction over

26   the defendants because the defendants transact business in this District.

27

28

## III.    VENUE

14.    Venue is proper in this District under 28 U.S.C. § 139 1(b) because the defendants transact business in this District.

## IV.    PARTIES

### Plaintiff

15.    The United States brings this action on behalf of its agency, the Department of Health and Human Services ("HHS") and its component, the Centers for Medicare & Medicaid Services ("CMS," formerly the Health Care Financing Administration ("HCFA")).

### Defendant Tenet Healthcare Corp.

16.    Defendant Tenet Healthcare Corp., at all times relevant to this action, was a for-profit hospital chain in the United States.  Directly and through its subsidiaries, Tenet Healthcare Corp. at certain times relevant to this action operated over 132 hospitals and ancillary health care facilities in at least 22 states.

17.    Tenet Healthcare Corp. is incorporated in Nevada with headquarters in Santa Barbara, California.

18.    Tenet Healthcare Corp. was formerly named "National Medical Enterprises, Inc." or "NME."

19.    On October 7, 1994, NME created a wholly-owned subsidiary, AMH Acquisition Co., whose sole purpose was to affect a merger with American Medical Holdings, Inc. ("AMH").

20.    On October 10, 1994, NME, AMH Acquisition Co., and AMH entered into an Agreement and Plan of Merger (hereinafter "the Merger Agreement").  The Merger Agreement provided that the certificate of incorporation of AMH Acquisition Co. would become the certificate of incorporation of the surviving corporation and that the directors of AMH Acquisition Co. would become the directors of the surviving corporation.  Jeffrey

1  Barbakow signed the Merger Agreement on behalf of both NME and AMH

2  Acquisition Co. as Chairman and CEO of both corporations.

3      21.    On or about March 1, 1995, AMH Acquisition Co. was merged into

4  AMH, leaving AMH as a wholly-owned subsidiary of NME.  AMH was the owner

5  of all outstanding shares of common stock of AMI, a Delaware corporation,

6  headquartered in Dallas, Texas.

7      22.    On June 23, 1995, NME changed its name to Tenet Healthcare Corp.

8  All references to Tenet Healthcare Corp. and Tenet herein refer also to NME for

9  the period September 6, 1992 through June 23, 1995.

10     23.    Through the foregoing merger, Tenet Healthcare Corp. acquired

11  both AMI and AMI's hospitals; and Tenet HealthSystem Medical, Inc. acquired

12  the liabilities of AMI.

13     24.    On November 30, 1995, Tenet Healthcare Corp.'s registered agent

14  filed amendments to the certificates of incorporation changing the names of AMH

15  to Tenet HealthSystem Holdings, Inc. and changing AMI to Tenet HealthSystem

16  Medical, Inc.

17     25.    Tenet HealthSystem Holdings, Inc. and Tenet HealthSystem Medical,

18  Inc. are incorporated in Delaware, with headquarters in Dallas, Texas and Santa

19  Barbara, California.

20     26.    Tenet Healthcare Corp. indirectly owns or owned the former AMI

21  hospitals through its intermediate subsidiaries, Tenet HealthSystem Holdings, Inc.

22  and Tenet HealthSystem Medical, Inc.

23     27.    Additionally, Tenet Healthcare Corp., Tenet HealthSystem Holdings,

24  Inc., and Tenet HealthSystem Medical, Inc. have numerous officers that are

25  officers of all of the corporations; and Tenet Healthcare raises capital for Tenet

26  HealthSystem Holdings, Inc. and Tenet HealthSystem Medical, Inc.

27

28

The Hospitals sued herein as Defendants

28.    Attached hereto as Attachment A, and incorporated herein, is a chart listing all hospitals that are sued in this action, with the hospital name, location, Medicare Provider Number, and the date AMI directly or indirectly acquired and/or sold the hospital, where known and occurring within the period September 6, 1992 to March 1, 1995. Listed below each hospital in Attachment A are the entities that form the present chain of ownership from Tenet Healthcare Corp. down to the hospital. If there are or were other entities within the chain of ownership for any of the hospitals listed in Attachment A, this information is within the exclusive control of defendants and is not known to the United States.

29.    Also included within Attachment A and incorporated by reference herein is a listing, by hospital, of the false claims of each of AMI's hospitals that the United States has discovered to date and for which it sues in this action.

30.    The official of the United States charged with responsibility to act in this circumstance did not know and reasonably could not have known the facts material to this right of action before May, 2002.

31.    Tenet Healthcare Corp., on behalf of itself and its subsidiaries (including AMI and AMI's hospitals), and the United States agreed to a tolling of the statute of limitations for the claims at issue in this action as of September 6, 2002.

**V.    THE PROSPECTIVE PAYMENT SYSTEM UNDER MEDICARE**

**A.    REIMBURSEMENT UNDER THE MEDICARE PROGRAM FOR HOSPITAL INPATIENT STAYS**

32.    In 1965, Congress enacted Title XVIII of the Social Security Act ("Medicare" or the "Medicare Program") to pay for the costs of certain health services and health care. Entitlement to Medicare is based on age, disability or affliction with end-stage renal disease. See 42 C.F.R. §§ 426, 426-1.

- 6 -

33.    HHS is responsible for the administration and supervision of the Medicare program. CMS is a component of HHS and is directly responsible for the administration of the Medicare program.

34.    Part A of the Medicare program authorizes payment for institutional care, including hospital, skilled nursing facility and home health care. See 42 U.S.C. §§ 1395c-1395i-5.

35.    Most hospitals, including all of AMI's hospitals, derive a substantial portion of their revenue from the Medicare program.

36.    All of the Medicare claims at issue in this action were submitted to the United States pursuant to the provisions of Part A of the Medicare program.

37.    Medicare beneficiaries are entitled to have payments made on their behalf for certain inpatient and outpatient hospital care and related services provided by a hospital (or "provider"). 42 U.S.C. § 1395d(a); 42 C.F.R. § 400.202.

38.    The Secretary of HHS reimburses the providers for Part A services, including all of AMI's hospitals, through Medicare contractors referred to as fiscal intermediaries ("FIs.") FIs are generally private insurance companies that are responsible for determining the amount of the payments to be made to providers. 42 U.S.C. §§ 1395h(a), 1395u(a).

39.    In 1983, Congress established the Prospective Payment System ("PPS") as the system by which hospitals are reimbursed for inpatient hospital costs.

40.    For all times material to this action, PPS was the system used to reimburse most hospitals, including all of the hospitals identified on Attachment A, for inpatient care.

41.    For all times material to this action, the PPS rates were based on Diagnosis Related Groups ("DRGs"), which were established by CMS as the basis of Medicare's hospital reimbursement system for the operating costs of inpatient

1    care.

2    42.    DRGs were a patient diagnosis classification system that provided a

3    means of relating the types of patients a hospital treats (referred to as its

4    "casemix") to the operating costs incurred by the hospital. Each DRG was defined

5    by a particular set of patient attributes that included the patient's principal

6    diagnosis, specific secondary diagnoses, procedures performed, age, sex, and

7    discharge status.  42 C.F.R. § 412.60.

8    43.    For all times material to this action, the diagnosis and procedure

9    codes that "grouped to" the DRGs were referred to as ICD-9-CM ("Internal

10    Classification of Diseases, 9th Revision, Clinical Modification") codes.

11    44.    For all times material to this Action, hospitals' claims were submitted

12    to the FIs on a form HCFA 1450 (UB-92) (hereinafter "UB-92").  For each patient

13    discharge, the hospital assigned and listed the ICD-9-CM codes on the UB-92, as

14    well as other patient information.

15    45.    For all times material to this Action, upon the basis of these ICD-9-

16    CM codes and information, the FIs classified (or "grouped") the patient discharge

17    to a DRG.  42 C.F.R. § 412.60.

18    46.    For all times material to this Action, only one DRG was assigned to

19    each patient discharge.  42 C.F.R. § 412.60(c)(2).

20    47.    For all times material to this Action, the DRGs formed the basis of

21    reimbursement.  CMS assigned to each DRG an appropriate weighting factor

22    (referred to as a "relative weight") that reflected the estimated relative cost of

23    hospital resources used with respect to patient discharges classified within that

24    group compared to patient discharges classified within other groups.  42 C.F.R. §

25    412.60(b).

26    48.    For all times material to this Action, a particular hospital's

27    reimbursement rate for a patient (known as "the blended rate") was determined by

28

- 8 -

1    the DRG's relative weight multiplied by the hospital's base rate. The hospital's

2    base rate was determined by a combination of factors, such as wage rates in the

3    region and certain specified geographic factors.    42 C.F.R. § 412.63.

4        49.    For all times material to this action, all providers, including all of

5    AMI's hospitals, who participated in the Medicare program did so by entering into

6    a Provider Agreement with the Secretary for HHS. 42 U.S.C. § 1395cc.

7        50.    For all times material to this action, the Provider Agreement required

8    each hospital to maintain a medical record for each individual evaluated or treated

9    by the hospital and required that the medical record contain information

10   supporting the ICD-9-CM codes assigned by the hospital. Health Insurance

11   Benefit Agreement, Form CMS- 1561; Requirements for Hospital Participation, 3

12   Medicare and Medicaid Guide (CCH) ¶ 12,340 at 4892; 42 C.F.R. § 482.24(c); 42

13   U.S.C. §§ 1395f(a), 1395n(a), 1395cc(a)(1).

14   **B.    CODING RULES**

15       51.    For all times material to this action, in order to receive

16   reimbursement, a hospital had to comply with conditions for payment contained in

17   the Medicare regulations. 42 C.F.R. § 4 12.40(a).

18       52.    For all times material to this action, if a hospital failed to comply with

19   the conditions for payment, CMS could have, as appropriate, withheld Medicare

20   payment (in whole or in part) until the hospital provided adequate assurances of

21   compliance or terminated the hospital's provider agreement. 42 C.F.R. §

22   412(b)(1), (2).

23       53.    For all times material to this action, hospitals, including all of AMI's

24   hospitals, were required to assign ICD-9-CM codes based on the diagnostic

25   statements of a patient's treating physician in that patient's medical record.  42

26   C.F.R. § 482.24 (c); Coding Clinic, 2d Q 1990, at 14.

27       54.    For all times material to this action, the Medicare regulations

28

1  explicitly stated that payment under the prospective payment system was based, in

2  part, on each patient's principal and secondary diagnoses and major procedures

3  performed, as evidenced by the physician's entries in the patient's medical record.

4  42 C.F.R. § 412.46(a).

5       55.    Thus, for all times material to this action, the Medicare regulations

6  required that for each physician, the hospital have on file the following physician

7  acknowledgment statement:

8         Notice to Physicians: Medicare payment to hospitals is based in part

9         on each patient's principal and secondary diagnoses and the major

10         procedures performed on the patient, as attested to by the patient's

11         attending physician by virtue of his or her signature in the medical

12         record. Anyone who misrepresents, falsifies, or conceals essential

13         information required for payment of Federal funds, may be subject to

14         fine, imprisonment, or civil penalty under applicable Federal laws.

15  42 C.F.R. § 4 12.46(b).

16       56.    For the time period of September 1, 1992 through August 31, 1995, in

17  addition to requiring hospitals to maintain the above notice to physicians on file,

18  the regulations also required physician attestations for each medical record.

19  Specifically, the regulations stated:

20         Physician attestation.  The attending physician must, shortly before,

21         at, or shortly after discharge (but before a claim is submitted), attest

22         to the principal diagnosis, secondary diagnoses, and names of major

23         procedures performed.  The information must be in writing in the

24         medical record, and. . the physician must sign the statement.  Below

25         the diagnostic and procedural information, and on the same page, the

26         following statement must immediately precede the physician's

27         signature:

28

- 10 -

1  "I certify that the narrative descriptions of the principal

2  and secondary diagnoses and the major procedures

3  performed are accurate and complete to the best of my

4  knowledge."

5  42 C.F.R. § 412.46(a).

6      57.    This physician attestation statement was usually provided to a

7  physician by a hospital on a form generated by the hospital that included narrative

8  descriptions of the physician's diagnoses, as well as the corresponding ICD-9-CM

9  codes.

10      58.    For all times material to this action, hospitals that participated in the

11  Medicare program were also required to adhere to the Hospital Manual ("Manual"

12  or "Hospital Manual"), a CMS publication.  The Hospital Manual provided

13  instructions to hospitals for implementation of the provisions of Title XVIII of the

14  Social Security Act and Medicare regulations as they relate to hospital benefits.

15  The Manual amplified the basic statutory provisions for coverage of services and

16  the requirements that had to be met for Medicare payment to be made.  The

17  Manual, *inter alia,* regulated the manner in which hospitals billed the Medicare

18  program for inpatient services.

19      59.    For all times material to this Action, the Hospital Manual required

20  hospitals in the PPS system to enter on the claim forms -- the UB-92s – the

21  appropriate ICD-9-CM codes (*i.e.*, the principal diagnosis, secondary diagnoses,

22  and procedure codes) in order to be reimbursed for their patient discharges.  The

23  Hospital Manual specified that, on inpatient claims, CMS accepted only those

24  ICD-9-CM diagnosis and procedural codes that used definitions included within

25  the Uniform Hospital Discharge Data Set ("UHDDS"). Hospital Manual, § 460,

26  FL 67.

27      60.    For all times material to this action, the Hospital Manual and the

28

UHDDS defined a principal diagnosis as "the condition established after study to be chiefly responsible for th[e] admission." Hospital Manual, § 460, FL 67; 50 Fed. Reg. 31038 (July 31, 1985). The Hospital Manual stated that "entering any other diagnosis may result in incorrect assignment of a DRG and cause [the hospital] to be incorrectly paid under PPS." Id.

61. For all times material to this action, secondary diagnoses that affected the DRG to which a patient discharge was assigned were referred to as complications and comorbidities. Complications were diagnoses that arose after the patient was hospitalized and comorbidities were diagnoses that existed at the time the patient was admitted to the hospital.

62. For all times material to this action, in order to select the appropriate ICD-9-CM codes for a patient's principal and secondary diagnoses, and procedures, the Hospital Manual referred hospitals to Volumes One through Three of the International Classification of Diseases, 9th Revision, Clinical Modification ("ICD9-CM Code Books"). Hospital Manual, § 417.1.

63. For all times material to this action, the ICD-9-CM Code Books contained all the ICD-9-CM codes approved by CMS and were the primary reference source used in the assignment of ICD-9-CM codes. The ICD-9-CM Code Books were maintained and revised each year by CMS and the National Center for Health Statistics. The ICD-9-CM Code Books detailed the coding conventions and the code selection process.

64. Additionally, for all times material to this action, CMS published annually a DRG Manual that described each DRG, and for each DRG, identified the ICD-9-CM codes that grouped to that DRG.

65. For all times material to this action, the Hospital Manual also described the "Grouper" computer programs that FIs used to select DRGs once the hospital had assigned the ICD-9-CM codes. Hospital Manual, § 417.

66.    For all times material to this action, Grouper was the software that FIs used to determine the DRG of each patient discharge based on the data elements that hospitals reported on each claims form.  Although the Grouper software had edits built into it that rejected incomplete or impossible codes, claims submitted with valid diagnosis codes that were incorrect because they did not represent the actual diagnoses of the patient could not be detected by the Grouper software.

67.    For all times material to this action, the Hospital Manual instructed that "[t]he responsibility for accuracy rest[ed] with [the hospital]." Hospital Manual, § 417.

68.    For all times material to this Action, based on the information in the foregoing publications, and by using the Grouper software, the hospital could control what DRG would be assigned to a claim by assigning particular ICD-9-CM codes to a patient discharge.

69.    For all times material to this Action, a hospital could predict its expected estimated reimbursement for any inpatient claim by multiplying the relative weight of the DRG assigned to the claim times that hospital's base rate. (See discussion supra.)

70.    For all times material to this Action, in addition to the Medicare program statutes, regulations, manuals, and ICD-9-CM Code Books, CMS provided detailed coding guidance through a publication called "Coding Clinic."

71.    For all times material to this Action, Coding Clinic was published quarterly by the American Hospital Association ("AHA"), of which Tenet and its hospitals were members.  The advice provided by Coding Clinic was from its Editorial Advisory Board, which was made up of representatives from what was referred to as "the cooperating organizations" -- AHA, AHIMA (American Health Information Management Association), CMS, and NCHS (National Center for Health Statistics).

72.    For all times material to this Action, CMS officially endorsed Coding Clinic, and Coding Clinic was the only publication providing coding advice that was endorsed by CMS.  54 Fed. Reg. 30561 (July 21, 1989).

73.    For all times material to this Action, Coding Clinic provided specific guidelines for diagnosis and procedure coding.

74.    In 1990, Coding Clinic published the Official Guidelines for Coding and Reporting (hereinafter "Official Coding Guidelines").

75.    For all times material to this Action, Coding Clinic repeatedly emphasized that coders must base their assignments of codes upon the physicians' documentation of the diagnoses in the medical records.  See, e.g., Coding Clinic, May - June 1984, at 12.

76.    The Official Coding Guidelines also required that coders base their assignments of codes upon the physicians' documentation of the diagnoses in the medical records.  Official Coding Guidelines, Coding Clinic, 2d Q 1990, § 3.2.

77.    Coding Clinic and the Official Coding Guidelines also emphasized that the principal diagnosis was the diagnosis, after study, chiefly responsible for the patient's admission to the hospital.  Official Coding Guidelines, Coding Clinic, 2d Q 1990, § 2.

78.    For all times material to this Action, Coding Clinic repeatedly instructed coders that code assignments should not be based upon the results of diagnostic tests, gram stains, or upon the basis of medications administered to patients, because such coding practices lead to errors in coding.

79.    The Official Coding Guidelines also instructed coders that code assignments should not be based upon the results of diagnostic tests.  Official Coding Guidelines, Coding Clinic, 2d Q 1990, § 3.5.

80.    For all times material to this Action, Coding Clinic also instructed coders not to code conditions that no longer existed at the time of the

- 14 -

1   hospitalization and not to assign separate codes for conditions that were integral to

2   the disease process that constituted the principal diagnosis.

3       81.    For all times material to this Action, Coding Clinic instructed coders

4   to query physicians before assigning diagnosis codes in instances where it

5   appeared to coders that particular diagnosis codes were appropriate but where the

6   physicians had not documented such diagnoses.

7       82.    For all times material to this Action, Coding Clinic also instructed

8   coders to follow the UHDDS definitions when assigning ICD-9-CM codes.

9       83.    In short, for all times material to this Action, in order for hospitals to

10  be reimbursed for patient care by the Medicare system, Medicare required that the

11  physician make the diagnoses, that the physician document in the medical record

12  the diagnoses, that the hospital coding and billing personnel submit only those

13  codes that correlated with the diagnoses made by the physician in the medical

14  record , and that those personnel adhere to coding guidelines when assigning

15  principal and secondary diagnoses.

16  **C.    THE ICD-9-CM CODES AND DRGs AT ISSUE IN THIS**

17  **ACTION**

18      **1.    DRG 079: PNEUMONIA DIAGNOSES ICD-9-CM**

19      **CODING RULES**

20      84.    The pneumonia diagnosis codes at issue in this action are ICD-9-CM

21  482.8, 482.83 and 482.89.

22      85.    Prior to October 1, 1992, ICD-9-CM code 482.8 covered pneumonia

23  caused by "other specified bacteria" *i.e.*, by one or more bacteria that the physician

24  had specifically identified but that was not described by any of the other

25  pneumonia diagnosis codes in the ICD-9-CM Code Books.

26      86.    Beginning on October 1, 1992, CMS added a fifth digit modifier to

27  ICD-9-CM code 482.8 so that certain bacteria causative of pneumonia could be

28

- 15 -

1  specifically identified on claim forms.

2      87.    Included among those codes that CMS added were: 482.83

3  (pneumonia due to other gram-negative bacteria); and 482.89 (pneumonia due to

4  other specified bacteria, not elsewhere classified).

5      88.    For all times material to this action, ICD-9-CM code 482.9 covered

6  "bacterial pneumonia unspecified." This code was used for those instances where

7  the physician had diagnosed bacterial pneumonia, but had not identified the

8  causative bacterium.

9      89.    For all times material to this action, ICD-9-CM code 486 covered

10  pneumonia, organism unspecified." This code was used for those instances where

11  the physician had diagnosed pneumonia, but had not identified the cause of the

12  pneumonia, whether bacterial, viral, or other.

13      90.    For all times material to this action, Medicare patients who were

14  eighteen years of age or older with a principal diagnosis ICD-9-CM code of 482.8,

15  482.83, or 482.89 and a complication or comorbidity, with no additional procedure

16  codes, were assigned or grouped to DRG 079.

17      91.    For all times material to this action, Medicare patients who were

18  eighteen years of age or older with a principal diagnosis ICD-9-CM code of 482.9

19  or 486 and a complication or comorbidity, but no procedure code, were assigned

20  or grouped to DRG 089.

21      92.    For all times material to this action, Medicare patients who were

22  eighteen years of age or older with a principal diagnosis ICD-9-CM code of 482.9

23  or 486 and no complication or comorbidity and no procedure code were assigned

24  or grouped to DRG 090.

25      93.    For all times material to this action, of these three DRGs, DRG 079

26  had the highest relative weight and claims that grouped to this DRG were

27  reimbursed at a higher rate than claims grouping to DRG 089 or 090.

28

94.    For all times material to this action, the exact reimbursement difference between DRG 079 and 089 varied somewhat depending upon the year at issue and a particular hospital's base rate, but on average, the reimbursement difference between DRG 089 and DRG 079 exceeded $4000 per claim.

95.    For all times material to this action, AMI's hospitals miscoded claims that were then submitted to the FIs and, due to the miscoding, were mistakenly grouped to DRG 079. The claims discovered by the United States to date that AMI's hospitals miscoded and for which AMI's hospitals consequently received payment at the DRG 079 rate are listed in Attachment A.

## 2.    DRGS 415 AND 416: SEPTICEMIA DIAGNOSES ICD-9-CM CODING RULES

96.    The septicemia codes at issue in this action are ICD-9-CM codes that begin with "038" and end with a variety of fourth and fifth digit modifiers, such as 038.0, 038.1, 038.11, 038.2, 038.42, 038.43, 038.44, 038.49, 038.8, and 038.9, depending upon what the defendants claimed to be the etiology of the septicemia, as well as ICD-9-CM 785.59 (septic shock).

97.    For all times material to this action, a Medicare patient who was eighteen years of age or older with one of the principal diagnosis JCD-9-CM codes specified in the preceding paragraph, grouped to DRG 416 (Septicemia), if no operating room procedure code were assigned, or to DRG 415 (Operating Room Procedure for Infectious and Parasitic Diseases), if there was also an operating room procedure performed.

98.    Additionally, for all times material to this action, if a Medicare patient had a principal diagnosis ICD-9 CM code of 790.7 (bacteremia), 958.3 (post-trauma wound infection), 998.5 (certain postoperative infections), 998.6 (persistent postoperative fistula), as well as certain other infectious and parasitic diseases, and an operating room procedure was performed, that claim would also

1  group to DRG 415.

2      99.    For all times material to this action, DRGs 416 and 415 had high

3  relative weights, and claims that grouped to these DRGs, rather than to other lower

4  weighted DRGs were reimbursed at a higher rate than those other lower weighted

5  DRGs.

6      100.    For all times material to this action, AMI's hospitals miscoded claims

7  that were then submitted to the FIs and, due to the miscoding, were mistakenly

8  grouped to DRG 415 or 416.  The claims discovered by the United States to date

9  that AMI's hospitals miscoded and for which AMI's hospitals consequently

10  received payment at the DRG 415 and 416 rates are listed in Attachment A.

11      3.    **DRG 475: RESPIRATORY SYSTEM DIAGNOSES**

12          **WITH VENTILATOR SUPPORT ICD-9-CM CODING**

13          **RULES**

14      101.    For all times material to this action, a Medicare patient with a

15  principal diagnosis code for a respiratory disease who was also placed upon a

16  mechanical ventilator grouped to DRG 475.

17      102.    For all times material to this action, DRG 475 had a high relative

18  weight, and claims that grouped to DRG 475 rather than to other lower weighted

19  DRGs were reimbursed at a higher rate than those other lower weighted DRGs.

20      103.    For all times material to this action, AMI's hospitals miscoded claims

21  that were then submitted to the FIs, and, due to the miscoding, were mistakenly

22  grouped to DRG 475. The claims discovered by the United States to date that

23  AMI's hospitals miscoded and for which AMI's hospitals consequently received

24  overpayments at the DRG 475 rate are listed in Attachment A.

25  ///

26  ///

27  ///

28

- 18 -

## VI.   THE CONDUCT OF AMI AND ITS HOSPITALS

### A.   AMI'S CORPORATE OVERSIGHT OF HOSPITALS

104.   For all times material to this action, AMI managed and oversaw its hospitals located nationwide through an organizational structure that was divided into two divisions (an Eastern Division and a Western Division).

105.   For all times material to this action, AMI's hospitals reported to the divisions, and the divisions reported to AMI headquarters.

### B.   THE CODING PROCESS AT AMI

106.   For all times material to this complaint, AMI's hospitals typically had departments referred to as a Health Information Management ("HIM") Department or a Medical Records Department (hereinafter referred to collectively as "HIM Department").

107.   The HIM Departments had one or more employees whose duties included coding inpatient medical records and who were referred to as "coders."

108.   Generally, each of AMI's hospital's HIM Department was headed by a Director who in turn reported to the hospital's Chief Financial Officer ("CFO").

109.   For all times material to this action, AMI instructed its hospitals that any case that required assignment of a complication or comorbidity to optimize payment should be referred to another coder or HIM director for re-review.

110.   For all times material to this action, after these reviews, the HIM Department submitted the coding information to the hospital's billing department and that department submitted the UB-92 to the FI for reimbursement.

111.   For all times material to this action, AMI corporate level Clinical Finance Managers conducted coding reviews of those medical records that AMI determined were "optimizable" — i.e., those with the potential for increased reimbursement from Medicare.

112.   Meanwhile, for all times material to this action, AMI rarely

1    conducted coding reviews with the purpose of ensuring that the hospitals adhered

2    to Medicare statutes, regulations, rules, and guidelines.

3         113.   For all times material to this action, AMI's corporate level Clinical

4    Finance Managers included Brenda Ward and Karen Rutledge.

5    **C.    LISTING OF THE SPECIFIC MISCODED CLAIMS AND**

6    **FALSE STATEMENTS OF AMI'S HOSPITALS DISCOVERED**

7    **BY THE GOVERNMENT TO DATE**

8         114.   Beginning at least as early as September 6, 1992 and continuing until

9    February 28, 1995, AMI's hospitals submitted or caused to be submitted more

10   than 2,400 false claims to Medicare for claims coded with diagnosis and procedure

11   codes that grouped to DRGs 079, 415, 416, and 475. As noted, each such false

12   claim was submitted on a UB-92 form that contained the ICD-9-CM codes

13   purporting to represent the appropriate principal and secondary diagnoses and

14   procedures performed.  Each such UB-92 contained at least one material false

15   statement: that the ICD-9-CM codes set forth on the UB-92 in fact represented the

16   correct principal and secondary diagnoses and procedures performed.

17        115.   For all times material to this complaint, the miscoded claims at AMI's

18   hospitals were due in large part to AMI's undue emphasis on "optimizing" DRGs

19   and hospital revenue with little or no emphasis on compliance with coding

20   regulations, and AMI's corporate-level review process that primarily reviewed

21   records with optimizable DRGs.

22        116.   The Medicare program paid all of those claims, and the United States

23   incurred actual damages due to such payments. As discussed above, each such

24   false claim also contained a false statement made to the government.

25        117.   Attachment A hereto lists the following UB-92 false claims submitted

26   or caused to be submitted by AMI and its hospitals.  These two groups of claims

27   are separately identified by footnotes in Attachment A:

28

i.        Claims determined to be false in an investigation by the United States (hereinafter, "the Group 1 claims"). These claims form the majority of the claims listed on Attachment A. The investigation was conducted by the HHS's Office of Inspector General, the Commercial Litigation Branch of the Department of Justice in Washington, D.C., and the Office of the United States Attorney for the Central District of California.

ii.       Claims determined to be false in another investigation by HHS and the Office of the United States Attorney for the Southern District of Indiana ("the Group 2 claims").

118. Contemporaneously with the filing of this Complaint, the United States has delivered to counsel for defendants a table identifying each patient medical chart that is associated with each claim listed in Attachment A hereto. On the table, each patient is identified by name, medical record number and/or patient claim number, date of discharge, hospital from which the patient was discharged, the ICD-9-CM codes assigned by the hospital, the DRG that resulted from the miscoding and for which the Medicare program paid, and the correct ICD-9-CM code and DRG to which the patient should have been assigned. In order to preserve the confidentiality of the patients' medical information, the patient identifier information does not appear in Attachment A to this Complaint.

119. To identify the Group 1 claims, the United States selected statistically valid random samples of Tenet Healthcare Corp.'s hospitals' Medicare DRG 079, 415, 416, and 475 claims during a specified period (see below).

120. In order to select the samples, the United States first obtained claims data from a CMS claims database (i.e., a federal government database). For these samples, the United States identified the relevant universe as the claims of all of

1  the hospitals that are presently listed on Attachment A, plus some additional

2  hospitals owned by Tenet, for 1991 through 1997 for DRG 079 and for 1991

3  through 1998 for DRGs 415, 416, and 475.  The United States then selected

4  random samples of these claims.

5      121.   The United States performed the selections using a proven random

6  sampling methodology.  This sampling methodology was a program called RAT-

7  STATS.  RAT-STATS is widely used by HHS's Office of Inspector General,

8  Office of Audit Services and by CMS to sample claims data and has been

9  validated as a sampling program by numerous recognized statistical tests for

10  randomness.

11      122.   Once the United States selected the statistical sample using the RAT-

12  STATS program, the United States subpoenaed from Tenet Healthcare Corp. the

13  medical records for each of the claims in the samples.

14      123.   The United States also retained expert coding consultants to conduct

15  coding reviews of the medical records produced by Tenet Healthcare Corp. in

16  response to the subpoenas.

17      124.   The coding reviewers reviewed the records that Tenet Healthcare

18  Corp. produced to determine which claims had been miscoded and which claims

19  had not been miscoded.  For each sample item that the coding reviewers

20  determined was miscoded, the coding reviewers also determined the correct DRG

21  to which the claim should have been coded.  The coding reviewers then provided

22  the United States with their tabulated results.

23      125.   Based upon the coding reviewers' results, the United States identified

24  the Group 1 false claims set forth in Attachment A hereto.  Further changes were

25  made to the results to eliminate years and hospitals that were included within the

26  above-described statistical samples but not included within this Action.

27      126.   To identify the Group 2 claims, the United States similarly selected

28

1 statistically valid random samples of AMI Culver Union Hospital's Medicare DRG

2 claims during a specified period.

3   127.   Once the United States selected the statistical sample, the United

4 States subpoenaed from AMI Culver Union Hospital the medical records for each

5 of the claims in the samples.

6   128.   The United States also retained expert coding consultants to conduct

7 coding reviews of the medical records produced by AMI Culver Union Hospital in

8 response to the subpoenas.

9   129.   The coding reviewers reviewed the records that were produced to

10 determine which claims had been miscoded and which claims had not been

11 miscoded.  For each sample item that the coding reviewers determined was

12 miscoded, the coding reviewers also determined the correct DRG to which the

13 claim should have been coded.  The coding reviewers then provided the United

14 States with their tabulated results.

15   130.   Based upon the coding reviewers' results, the United States identified

16 the Group 2 false claims set forth in Attachment A hereto.  Further changes were

17 made to the results to eliminate years that were included within the above-

18 described statistical sample but not included within this Action.

19   131.   The United States sues herein for all false claims due to AMI and its

20 hospitals' miscoding that ensured grouping to DRGs 079, 416, 415, and 475

21 during the period of liability alleged in this Complaint, including but not limited to

22 the specific false claims listed on Attachment A.  Upon information and belief,

23 there are such false claims in addition to those listed on Attachment A.  The basis

24 of this belief is that the majority of the claims listed on Attachment A were located

25 through the random statistical sampling process described above, whose results are

26 properly extrapolated to a larger universe.  In addition, the fact that false claims

27 were found through one random sampling indicates that additional claims may be

28

- 23 -

1   found through an additional random sampling.

2      132.   The United States reserves the right, at trial of this action or in any

3   other proceeding herein, to present other evidence of false claims, including but

4   not limited to other statistical samples that have been analyzed to identify false

5   claims.

6      133.   In addition to the UB-92 false claims, during the period from

7   September 6, 1992 through February 28, 1995, AMI's hospitals submitted, and

8   caused to be submitted, cost reports to the FIs, based on improperly claimed

9   DRGs.  Each such cost report contained a false certification by the officer or

10  administrator of the provider that the cost report was "a true, correct, and complete

11  statement prepared from the books and records of the provider" and that "the

12  services identified in this cost report were provided in compliance with" "the laws

13  and regulations regarding the provision of health care services."

14

15                                **COUNTS**

16

17                        **FIRST CAUSE OF ACTION**

18                        **AGAINST ALL DEFENDANTS**

19                            (Payment By Mistake)

20

21      134.   Plaintiff United States repeats and realleges each allegation in ¶¶ 1

22  through 133, as if fully set forth herein.

23      135.   As a result of the conduct described in this count, the United States

24  paid AMI's hospitals certain government funds to which defendants were not

25  entitled.

26      136.   At the time the United States made such payments, the United States

27  was unaware of the conduct described in this count and mistakenly believed that

28

the claims it was paying were not upcoded. The United States' erroneous belief was material to making the payments at issue; had the United States known the true facts, the United States would not have approved the payment of such funds.

137.   By reason of its mistake of fact, the United States is entitled to restitution from defendants in the amount of the payment the United States made to which defendants are not entitled.

### SECOND CAUSE OF ACTION
### AGAINST ALL DEFENDANTS
(Negligent Misrepresentation)

138.   Plaintiff United States repeats and realleges each allegation in ¶¶ 1 through 133, as if fully set forth herein.

139.   As noted, each UB-92 that contained each miscoded claim listed on Attachment A hereto contained at least one material false statement: that the ICD-9-CM codes set forth on the UB-92 in fact represented the correct principal and secondary diagnoses and procedures performed.

140.   As noted, each cost report submitted to the government or its FI by AMI's hospitals contained the following false statements:

(1) that the cost report was "a true, correct, and complete statement prepared from the books and records of the provider" and

(2) that "the services identified in this cost report were provided in compliance with" "the laws and regulations regarding the provision of health care services."

141.   As to each of the foregoing false representations, each defendant that made the false representation and each defendant that caused that false representation to be submitted to the respective FI or the United States did so both

1  on behalf of itself and as an agent of AMI, intending that the United States rely on

2  the supposed accuracy of the representation.

3      142.   With respect to the false representations in the UB-92s, the intended

4  reliance consisted of the United States' paying Medicare reimbursements based

5  upon the UB-92s. With respect to the false representations in the cost reports, the

6  intended reliance consisted of the United States' settling the cost reports at an

7  inflated amount and paying inflated tentative settlements based on the cost reports.

8      143.   Upon information and belief, as to each of the foregoing false

9  representations, each defendant that made the false representation and each

10  defendant that caused that false representation to be submitted to the respective FI

11  or the United States did so with no reasonable ground for believing that the

12  representation was true.

13      144.   As to each such false representation, the United States was ignorant

14  of its falsity, believed it to be true, and justifiably relied upon it. With respect to

15  the false representations in the UB-92s, the United States' reliance consisted of

16  paying Medicare reimbursements based upon the UB-92s. With respect to the

17  false representations in the cost reports, the United States' reliance consisted of the

18  United States' settling the cost reports at an inflated amount and paying inflated

19  tentative settlements based on the cost reports. Had the United States known the

20  truth, the United States would not have so acted and refrained from acting to its

21  detriment.

22      145.   As a proximate result of the aforesaid false statements and the facts

23  herein alleged, the United States has sustained damages in an amount not yet

24  ascertained with sufficient specificity to state the dollar amount thereof.

25  ///

26  ///

27  ///

28

# PRAYER FOR RELIEF

WHEREFORE, the United States prays that judgment be entered in favor of the United States as follows:

1.      On the First Cause of Action, for Payment by Mistake, for Payment by Mistake, for restitution to the United States in the amount of the payment the United States made pursuant to the miscoded claims, plus interest, costs, and expenses, and such further relief as may be just and proper.

2.      On the Second Cause of Action, for Negligent Misrepresentation, for the United States' compensatory damages, plus interest, costs, and expenses, and such further relief as may be just and proper.

Date: February 6, 2004                   Respectfully submitted,

**PETER D. KEISLER**
Assistant Attorney General
**DEBRA W. YANG**
United States Attorney

**DONNA C. MAIZEL**
Assistant United States Attorney

Diana J. Younts
by AUSA Donna C. Maizel

**MICHAEL F. HERTZ**
**LAURENCE J. FREEDMAN**
**JOHN F. HENEBERY**
**LOUIS J. VIRELLI**
**DIANA J. YOUNTS**

Attorneys, Civil Division
U.S. Department of Justice
P.O. Box 261
Ben Franklin Station
Washington, D.C.  20044
Telephone: 202/ 305-8586

Attorneys for the United States of America

- 27 -

1    ## DEMAND FOR JURY TRIAL

2
       The United States hereby demands a trial by jury.

3

4
Date: February 6, 2004                          Respectfully submitted,

5
                                  **PETER D. KEISLER**
6
                                  Assistant Attorney General
                                  **DEBRA W. YANG**
7
                                  United States Attorney

8

9
                                  **DONNA C. MAIZEL**
                                  Assistant United States Attorney
10

11

12
                                  **MICHAEL F. HERTZ**
                                  **LAURENCE J. FREEDMAN**
13
                                  **JOHN F. HENEBERY**
                                  **LOUIS J. VIRELLI**
14
                                  **DIANA J. YOUNTS**

15

16
                                  Attorneys, Civil Division
                                  U.S. Department of Justice
17
                                  P.O. Box 261
                                  Ben Franklin Station
18
                                  Washington, D.C.  20044
                                  Telephone: 202/ 305-8586

19
                                  Attorneys for the United States of
                                  America
20

21

22

23

24

25

26

27

28

1

<u>Attachments</u>

2

3    Attachment A..........................................................................Identification of False
Claims Discovered to Date and of Defendant Hospitals

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Attch
A

Attachment "A": For each of AMI's hospitals, every miscoded UB-92 claim discovered by the government to date, identified by a unique number and the patient's discharge date. [1], [2]

| AMI Hospitals | | | | | |
|---|---|---|---|---|---|
| Hospital Name<br>Provider #<br>Location<br><br>Ownership Data (Chain of Ownership from Tenet Healthcare Corp.) | Liability from 09/06/1992 until 03/01/1995 unless otherwise noted. | DRG 079 claims<br><br>(With discharge date and correct DRG noted) | DRG 415 claims<br><br>(With discharge date and correct DRG noted) | DRG 416 claims<br><br>(With discharge date and correct DRG noted) | DRG 475 claims<br><br>(With discharge date and correct DRG noted) |
| AMISUB (Culver Union Hospital), Inc., dba **AMI Culver Union Hospital** (aka  Culver Union Hospital) [3]<br><br>Prov. # 150022<br>Crawfordsville, IN<br><br>Tenet HealthSystem Holdings, Inc.; Tenet HealthSystem Medical, Inc. | | [501]<br>10/03/1992 (89)<br>[502]<br>10/08/1992 (89)<br>[503]<br>10/21/1992 (89)<br>[504]<br>10/24/1992 (89)<br>[505]<br>11/02/1992 (89)<br>[506]<br>11/19/1992 (89)<br>[507]<br>12/01/1992 (89)<br>[508]<br>12/09/1992 (87)<br>[509]<br>01/08/1993 (89)<br>[510]<br>01/19/1993 (89)<br>[511]<br>01/20/1993 (89)<br><br>(Continued next page) | | | |

---

[1] Unless specifically noted, all claims were determined to be false in an investigation conducted by the Department of Health and Human Services (HHS), Office of Inspector General, the Commercial Litigation Branch of the Department of Justice in Washington, D.C., and the Office of the United States Attorney in and for the Central District of California (Group 1 claims).

[2] All listed hospitals were owned indirectly by AMI during the period of liability in this complaint (09/06/1992 to 03/01/1995).

[3] Claims for AMI Culver Union Hospital only were determined to be false in an investigation by HHS and the Office of the United States Attorney in and for the Southern District of Indiana (Group 2 claims).


ATTACHMENT A

30

| AMI Hospitals | | | | | |
|---|---|---|---|---|---|
| **Hospital Name Provider # Location**<br><br>**Ownership Data (Chain of Ownership from Tenet Healthcare Corp.)** | **Liability from 09/06/1992 until 03/01/1995 unless otherwise noted.** | **DRG 079 claims**<br><br>**(With discharge date and correct DRG noted)** | **DRG 415 claims**<br><br>**(With discharge date and correct DRG noted)** | **DRG 416 claims**<br><br>**(With discharge date and correct DRG noted)** | **DRG 475 claims**<br><br>**(With discharge date and correct DRG noted)** |
| AMISUB (Culver Union Hospital), Inc., dba **AMI Culver Union Hospital** (aka Culver Union Hospital)<br><br>(Continued from previous page) | | (Continued from previous page)<br>[512] 01/25/1993 (89)<br>[513] 02/02/1993 (89)<br>[514] 02/16/1993 (89)<br>[515] 02/24/1993 (89)<br>[516] 02/27/1993 (89)<br>[517] 03/01/1993 (89)<br>[518] 03/06/1993 (89)<br>[519] 03/07/1993 (89)<br>[520] 03/09/1993 (89)<br>[521] 03/09/1993 (89)<br>[522] 03/11/1993 (89)<br>[523] 03/17/1993 (89)<br>[524] 03/22/1993 (89)<br>[525] 03/26/1993 (89)<br>[526] 04/05/1993 (89)<br>[527] 04/23/1993 (89)<br>[528] 04/30/1993 (89)<br>[529] 05/10/1993 (89)<br>[530] 06/07/1993 (89)<br>[531] 06/17/1993 (89)<br>[532] 06/30/1993 (89)<br>[533] 07/01/1993 (89)<br>[534] 07/02/1993 (89)<br>[535] 07/04/1993 (89)<br>[536] 07/18/1993 (89)<br>[537] 07/24/1993 (127)<br>[538] 07/30/1993 (89)<br>[539] 08/24/1993 (89)<br>[540] 09/22/1993 (89)<br>[541] 10/11/1993 (89)<br>[542] 11/25/1993 (89)<br>[543] 12/09/1993 (89)<br>[544] 12/17/1993 (89)<br>[545] 01/23/1994 (89)<br>[546] 01/28/1994 (89)<br>[547] 04/01/1994 (89)<br>[548] 04/02/1994 (89)<br>[549] 04/12/1994 (89)<br>[550] 04/19/1994 (89)<br>[551] 06/02/1994 (89)<br>[552] 07/05/1994 (89)<br>[553] 07/06/1994 (89)<br>[554] 07/15/1994 (89)<br>[555] 08/15/1994 (89)<br>[556] 09/13/1994 (89)<br>[557] 01/09/1995 (89)<br>[558] 01/24/1995 (89)<br>[559] 02/02/1995 (89)<br>[560] 02/27/1995 (89) | | | |

31

| AMI Hospitals | | | | | |
|---|---|---|---|---|---|
| Hospital Name<br>Provider #<br>Location<br><br>Ownership Data (Chain of Ownership from Tenet Healthcare Corp.) | Liability from 09/06/1992 until 03/01/1995 unless otherwise noted. | DRG 079 claims<br><br>(With discharge date and correct DRG noted) | DRG 415 claims<br><br>(With discharge date and correct DRG noted) | DRG 416 claims<br><br>(With discharge date and correct DRG noted) | DRG 475 claims<br><br>(With discharge date and correct DRG noted) |
| AMI/HTI Tarzana Encino Joint Venture dba **AMI Tarzana Regional Medical Center** (aka Tarzana Regional)<br><br>Prov. # 050601<br>Tarzana, CA<br><br>Tenet HealthSystem Holdings, Inc.; Tenet HealthSystem Medical, Inc. | | [561]<br>03/29/1994 (89)<br>[562]<br>05/16/1994 (89)<br>[563]<br>12/08/1994 (89)<br>[564]<br>12/11/1994 (89)<br>[565]<br>01/17/1995 (89)<br>[566]<br>02/14/1995 (90) | | | |
| Brookwood Health Services, Inc., dba **Brookwood Medical Center**<br><br>Prov. # 010139<br>Birmingham, AL<br><br>Tenet HealthSystem Holdings, Inc.; Tenet HealthSystem Medical, Inc. | | | | [567]<br>01/30/1995 (452) | |
| Tenet Healthcare, Ltd., dba **Brownsville Medical Center**<br><br>Prov. # 450028<br>Brownsville, TX<br><br>Tenet HealthSystem Holdings, Inc.; Tenet HealthSystem Medical, Inc.; American Medical (Central), Inc.; Lifemark Hospitals, Inc. | | [568]<br>05/12/1993 (89)<br>[569]<br>05/16/1993 (89)<br>[570]<br>06/04/1993 (89)<br>[571]<br>02/08/1994 (89)<br>[572]<br>04/12/1994 (89)<br>[573]<br>01/12/1995 (89) | | | |

32

| AMI Hospitals | | | | | |
|---|---|---|---|---|---|
| Hospital Name Provider # Location<br><br>Ownership Data (Chain of Ownership from Tenet Healthcare Corp.) | Liability from 09/06/1992 until 03/01/1995 unless otherwise noted. | DRG 079 claims<br><br>(With discharge date and correct DRG noted) | DRG 415 claims<br><br>(With discharge date and correct DRG noted) | DRG 416 claims<br><br>(With discharge date and correct DRG noted) | DRG 475 claims<br><br>(With discharge date and correct DRG noted) |
| AMI/HTI Tarzana Encino Joint Venture dba **Encino-Tarzana Regional Medical Center**<br><br>Prov. # 050158 Encino, CA<br><br>Tenet HealthSystem Holdings, Inc.; Tenet HealthSystem Medical, Inc. | | [574] 09/15/1993 (89) | [575] 10/04/1993 (263) | | |
| Frye Regional Medical Center, Inc., dba **Frye Regional Medical Center**<br><br>Prov. # 340116 Hickory, NC<br><br>Tenet HealthSystem Holdings, Inc.; Tenet HealthSystem Medical, Inc. | | [576] 02/27/1993 (89) [577] 06/02/1993 (89) [578] 11/28/1993 (89) [579] 11/29/1993 (89) [580] 12/03/1993 (89) [581] 01/31/1994 (89) [582] 02/08/1994 (89) [583] 02/17/1994 (89) [584] 06/26/1994 (89) [585] 09/01/1994 (89) [586] 01/15/1995 (89) | | | |

33

| AMI Hospitals | | | | | |
|---|---|---|---|---|---|
| Hospital Name Provider # Location<br><br>Ownership Data (Chain of Ownership from Tenet Healthcare Corp.) | Liability from 09/06/1992 until 03/01/1995 unless otherwise noted. | DRG 079 claims<br><br>(With discharge date and correct DRG noted) | DRG 415 claims<br><br>(With discharge date and correct DRG noted) | DRG 416 claims<br><br>(With discharge date and correct DRG noted) | DRG 475 claims<br><br>(With discharge date and correct DRG noted) |
| Medical Center of Garden Grove, Inc., dba **Garden Grove Hospital and Medical Center**<br><br>Prov. # 050230<br>Garden Grove, CA<br><br>Tenet HealthSystem Holdings, Inc.; Tenet HealthSystem Medical, Inc. | | [587] 11/25/1992 (89)<br>[588] 01/25/1993 (89)<br>[589] 09/20/1993 (89) | [590] 10/04/1994 (168) | | [591] 05/20/1994 (449) |
| Lifemark Hospitals of Louisiana, Inc., dba **Kenner Regional Medical Center**<br><br>Prov. # 190206<br>Kenner, LA<br><br>Tenet HealthSystem Holdings, Inc.; Tenet HealthSystem Medical, Inc.; American Medical (Central), Inc.; Lifemark Hospitals, Inc. | | [592] 09/22/1994 (89) | | | |
| Memorial Hospital of Tampa, L.P., dba **Memorial Hospital of Tampa**<br><br>Prov. # 100206<br>Tampa, FL<br><br>Tenet HealthSystem Holdings, Inc.; Brookwood Health Services, Inc.; Brookwood Medical Center of Tampa, Inc. | | [593] 04/14/1993 (89)<br><br>[594] 03/16/1994 (89) | | | |

Page 5 of 11

34

| AMI Hospitals | | | | | |
|---|---|---|---|---|---|
| Hospital Name Provider # Location<br><br>Ownership Data (Chain of Ownership from Tenet Healthcare Corp.) | Liability from 09/06/1992 until 03/01/1995 unless otherwise noted. | DRG 079 claims<br><br>(With discharge date and correct DRG noted) | DRG 415 claims<br><br>(With discharge date and correct DRG noted) | DRG 416 claims<br><br>(With discharge date and correct DRG noted) | DRG 475 claims<br><br>(With discharge date and correct DRG noted) |
| Tenet Beaumont Healthsystem, Inc., dba **Mid-Jefferson Hospital**<br><br>Prov. #450514<br>Nederland, TX<br><br>Tenet HealthSystem Hospitals, Inc. | | [595]<br>09/08/1993 (89) | | | |
| Tenet Healthcare, Ltd., dba **Nacogdoches Medical Center Hospital**<br><br>Prov.# 450656<br>Nacogdoches, TX<br><br>Tenet HealthSystem Holdings, Inc.; Tenet HealthSystem Medical, Inc.; American Medical (Central), Inc.; Lifemark Hospitals, Inc. | | [596]<br>12/04/1993 (89)<br>[597]<br>02/09/1994 (89) | | | |
| National Park Medical Center, Inc., dba **National Park Medical Center** (aka AMI National Park)<br><br>Prov. # 040078<br>Hot Springs, AR<br><br>Tenet HealthSystem Holdings, Inc.; Tenet HealthSystem Medical, Inc. | | [598]<br>11/30/1993 (89) | [599]<br>10/28/1994 (213) | | |

Page 6 of 11

35

| AMI Hospitals | | | | | |
|---|---|---|---|---|---|
| **Hospital Name** **Provider #** **Location** **Ownership Data (Chain of Ownership from Tenet Healthcare Corp.)** | **Liability from 09/06/1992 until 03/01/1995 unless otherwise noted.** | **DRG 079 claims** **(With discharge date and correct DRG noted)** | **DRG 415 claims** **(With discharge date and correct DRG noted)** | **DRG 416 claims** **(With discharge date and correct DRG noted)** | **DRG 475 claims** **(With discharge date and correct DRG noted)** |
| North Fulton Medical Center, Inc., dba **North Fulton Regional Hospital** Prov. #110198 Roswell, GA Tenet HealthSystem Holdings, Inc.; Tenet HealthSystem Medical, Inc. | | [600] 11/09/1993 (122) | [601] 06/29/1994 (416) | | |
| AMISUB (North Ridge Hospital), Inc., dba **North Ridge Medical Center** Prov. # 100237 Fort Lauderdale, FL Tenet HealthSystem Holdings, Inc.; Tenet HealthSystem Medical, Inc. | | [602] 10/13/1993 (89) [603] 01/11/1994 (89) [604] 03/15/1994 (89) [605] 08/11/1994 (88) | [606] 12/11/1993 (440) | | |
| Palm Beach Gardens Community Hospital, Inc., dba **Palm Beach Gardens Medical Center** Prov. # 100176 Palm Beach Gardens, FL Tenet HealthSystem Holdings, Inc.; Tenet HealthSystem Medical, Inc. | | [607] 07/06/1994 (89) | [608] 01/06/1993 (418) [609] 10/25/1993 (418) | | |

Page 7 of 11

36

| AMI Hospitals | | | | | |
|---|---|---|---|---|---|
| Hospital Name Provider # Location<br><br>Ownership Data (Chain of Ownership from Tenet Healthcare Corp.) | Liability from 09/06/1992 until 03/01/1995 unless otherwise noted. | DRG 079 claims<br><br>(With discharge date and correct DRG noted) | DRG 415 claims<br><br>(With discharge date and correct DRG noted) | DRG 416 claims<br><br>(With discharge date and correct DRG noted) | DRG 475 claims<br><br>(With discharge date and correct DRG noted) |
| Lifemark Hospitals of Florida, Inc., dba **Palmetto General Hospital** (aka Lifemark at Palmetto)<br><br>Prov. # 100187 Hialeah, FL<br><br>Tenet HealthSystem Holdings, Inc.; Tenet HealthSystem Medical, Inc.; American Medical (Central), Inc.; Lifemark Hospitals, Inc. | | **[610]** 03/19/1993 (89) | | | |
| Tenet Healthcare, Ltd., dba **Park Place Medical Center**<br><br>Prov. # 450518 Port Arthur, TX<br><br>Tenet HealthSystem Holdings, Inc.; Tenet HealthSystem Medical, Inc.; American Medical (Central), Inc.; Lifemark Hospitals, Inc. | | **[611]** 08/11/1994 (89) | | | |

| AMI Hospitals | | | | | |
|---|---|---|---|---|---|
| **Hospital Name Provider # Location**<br><br>**Ownership Data (Chain of Ownership from Tenet Healthcare Corp.)** | **Liability from 09/06/1992 until 03/01/1995 unless otherwise noted.** | **DRG 079 claims**<br><br>**(With discharge date and correct DRG noted)** | **DRG 415 claims**<br><br>**(With discharge date and correct DRG noted)** | **DRG 416 claims**<br><br>**(With discharge date and correct DRG noted)** | **DRG 475 claims**<br><br>**(With discharge date and correct DRG noted)** |
| Tenet Healthcare, Ltd., dba<br>**Park Plaza Hospital**<br><br>Prov. # 450659<br>Houston, TX<br><br>Tenet HealthSystem Holdings, Inc.; Tenet HealthSystem Medical, Inc.; American Medical (Central), Inc.; Lifemark Hospitals, Inc. | | [612]<br>12/18/1993 (89) | [613]<br>11/24/1992 (304) | | |
| AMISUB of South Carolina, Inc., dba<br>**Piedmont Medical Center**<br><br>Prov. # 420002<br>Rock Hill, SC<br><br>Tenet HealthSystem Holdings, Inc.; Tenet HealthSystem Medical, Inc. | | [614]<br>07/19/1993 (89)<br>[615]<br>01/28/1994 (89)<br>[616]<br>08/18/1994 (89)<br>[617]<br>11/23/1994 (89) | [618]<br>10/16/1993 (120) | | |
| AMISUB (SFH), Inc., dba<br>**St. Francis Hospital**<br><br>Prov. # 440183<br>Memphis, TN<br><br>Tenet HealthSystem Holdings, Inc.; Tenet HealthSystem Medical, Inc. | | [619]<br>02/03/1993 (96)<br>[620]<br>05/23/1994 (398) | [621]<br>11/25/1992 (418) | [622]<br>02/15/1993 (89) | |

Page 9 of 11

38

| AMI Hospitals | | | | | |
|---|---|---|---|---|---|
| Hospital Name<br>Provider #<br>Location<br><br>Ownership Data (Chain of Ownership from Tenet Healthcare Corp.) | Liability from 09/06/1992 until 03/01/1995 unless otherwise noted. | DRG 079 claims<br><br>(With discharge date and correct DRG noted) | DRG 415 claims<br><br>(With discharge date and correct DRG noted) | DRG 416 claims<br><br>(With discharge date and correct DRG noted) | DRG 475 claims<br><br>(With discharge date and correct DRG noted) |
| St. Mary's Regional Medical Center, Inc., dba **St. Mary's Regional Medical Center**<br><br>Prov. # 040041<br>Russellville, AR<br><br>Tenet HealthSystem Holdings, Inc.; Tenet HealthSystem Medical, Inc. | | [623]<br>12/01/1992 (89)<br>[624]<br>05/05/1994 (89)<br>[625]<br>06/06/1994 (89)<br>[626]<br>08/15/1994 (87) | | | |
| Tenet HealthSystem Medical, Inc., dba **San Dimas Community Hospital**<br><br>Prov. # 050588<br>San Dimas, CA<br><br>Tenet HealthSystem Holdings, Inc. | | [627]<br>02/26/1994 (89) | | | |
| Sierra Vista Hospital, Inc., dba **Sierra Vista Regional Medical Center**<br><br>Prov. # 050506<br>San Luis Obispo, CA<br><br>Tenet HealthSystem Holdings, Inc.; Tenet HealthSystem Medical, Inc. | | | [628]<br>08/18/1994 (195) | | |

Page 10 of 11

39

| AMI Hospitals | | | | | |
|---|---|---|---|---|---|
| Hospital Name Provider # Location<br><br>Ownership Data (Chain of Ownership from Tenet Healthcare Corp.) | Liability from 09/06/1992 until 03/01/1995 unless otherwise noted. | DRG 079 claims<br><br>(With discharge date and correct DRG noted) | DRG 415 claims<br><br>(With discharge date and correct DRG noted) | DRG 416 claims<br><br>(With discharge date and correct DRG noted) | DRG 475 claims<br><br>(With discharge date and correct DRG noted) |
| Tenet HealthSystem Spalding, Inc., dba **Spalding Regional Hospital**<br><br>Prov. # 110031<br>Griffin, GA<br><br>Tenet HealthSystem Holdings, Inc.; Tenet HealthSystem Medical, Inc. | | [629]<br>02/04/1994 (89) | | | |
| Three Rivers Healthcare, Inc., dba **Three Rivers Healthcare North Campus** (aka Lucy Lee Hospital)<br><br>Prov. # 260120<br>Poplar Bluff, MO<br>Tenet HealthSystem Holdings, Inc.; Tenet HealthSystem Medical, Inc. | | [630]<br>12/19/1993 (89)<br>[631]<br>12/29/1993 (80)<br>[632]<br>03/31/1994 (89)<br>[633]<br>05/10/1994 (89)<br>[634]<br>10/18/1994 (87) | | | |

Page 11 of 11

40

## PROOF OF SERVICE BY FACSIMILE TRANSMISSION AND

## FEDERAL EXPRESS DELIVERY

I am over the age of 18 and not a party to the within action. I am employed by the Office of United States Attorney, Central District of California. My business address is 300 North Los Angeles Street, Suite 7516, Los Angeles, California 90012.

On February 6, 2004, I served **COMPLAINT (AMI)** on each person or entity named below by faxing and enclosing a copy in an envelope addressed as shown below and placing the envelope for collection and sending by Federal Express on the date and at the place shown below following our ordinary office practices. I am readily familiar with the practice of this office for collection and processing correspondence for mailing.

Date of mailing: February 6, 2004. Place of mailing: Los Angeles, California.

Person(s) and/or Entity(s) to Whom mailed:

   *SEE ATTACHMENT*

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on: February 6, 2004 at Los Angeles, California.

ZENAIDA A. ROSACIA

1 <u>Attachment</u>

2
Nick T. Hanna
3 Alan Gordee
GIBSON, DUNN & CRUTCHER LLP
4 Jamboree Center
4 Park Plaza, Suite 1400
5 Irvine, CA 92614-8557
*Fax No. (949) 451-4220*

6

7 David Schindler
Russell Hayman
8 LATHAM & WATKINS LLP
633 West Fifth Street
9 Suite 4000
Los Angeles, CA 90071-2007
10 *Fax No. (213) 891-8763*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28